TAX COURT OF NEW JERSEY



**Joshua D. Novin**
**Judge**

**Washington & Court Streets, 1ˢᵗ Fl.**
**P.O. Box 910**
**Morristown, New Jersey 07963**
**Tel: (973) 656-3931 Fax: (973) 656-4305**

NOT FOR PUBLICATION WITHOUT THE APPROVAL
OF THE TAX COURT COMMITTEE ON OPINIONS

June 2, 2017

Michael Ash, Esq.
DeCotiis, FitzPatrick & Cole, LLP
Glenpoint Centre West
500 Frank W. Burr Boulevard, Suite 31
Teaneck, New Jersey 07666

Robert F. Renaud, Esq.
Palumbo, Renaud & DeAppolonio, LLC
190 North Avenue East
Cranford, New Jersey 07016

> Re: <u>M-C Properties Co. Rlty (Mack-Cali) v. Cranford Township</u>
> Docket Nos. 003055-2009, 000820-2010, 003423-2011, 002362-2012
> and 006455-2013

Dear Mr. Ash and Mr. Renaud:

This letter constitutes the court's opinion following trial of the local property tax appeals in the above-referenced matters. M-C Properties Co. Rlty (Mack-Cali) ("plaintiff") challenges the 2009, 2010, 2011, 2012 and 2013 local property tax assessments on an improved parcel of real property in the Township of Cranford ("defendant"), County of Union and State of New Jersey.

For the reasons stated more fully below, the court reduces the 2009, 2010, 2011, 2012 and 2013 tax year assessments.

## I.    <u>Procedural History and Findings of Fact</u>

As of the valuation dates, plaintiff was the owner of the real property and improvements located at 10-12 Commerce Drive, Cranford, New Jersey. The property is identified on the

municipal tax map of Cranford Township as Block 636, Lot 3 (the "subject property"). For the 2009, 2010, 2011, 2012 and 2013 tax years, the subject property was assessed as follows:

Land:          $2,422,200
Improvement: $   730,800
Total:         $3,153,000

The average ratio of assessed to true value, commonly referred to as the Chapter 123 ratio, for Cranford Township was 38.42% for the 2009 tax year, 39.05% for the 2010 tax year, 40.00% for the 2011 tax year, 40.30% for the 2012 tax year and 41.15% for the 2013 tax year. See N.J.S.A. 54:1-35a(a). When the average ratio is applied to the local property tax assessment, the implied equalized value of the subject property is: $8,206,663.10 for the 2009 tax year; $8,074,263.70 for the 2010 tax year; $7,882,500 for the 2011 tax year; $7,823,821.30 for the 2012 tax year; and $7,662,211.40 for the 2012 tax year.

The subject property is an irregularly shaped 6.28-acre lot along Commerce Drive located in the Cranford Business Park. The Cranford Business Park consists of a mixture of Class A, B and C office buildings, office/flex/warehouse/industrial buildings and a hotel, and is located adjacent to the Garden State Parkway. Primary access to the Cranford Business Park is provided from Raritan Road and secondary access from Myrtle Street. As of the valuation dates the subject property was improved with a one and part two-story masonry, multi-tenanted, mixed use, office/flex/warehouse building.

The structure was initially constructed in 1968 for Zenith Corporation ("Zenith") and contains approximately 72,260 square feet of gross leasable building area (the "building").[1] The building formerly housed Zenith's showroom, offices, warehouse and distribution center. In or about 1974, plaintiff's predecessor acquired the subject property and leased it back to Zenith. In the mid-1980's the showroom was converted into a fitness center and the remaining portions of

---

[1] Plaintiff and defendant stipulated that the gross rentable area of the building was 72,260 square feet.

the building were leased to tenants for office and ancillary storage uses. The building has an unusual configuration, consisting of three separate segments connected by a common lobby. The building contains approximately 17,000 square feet of windowless area of which 14,466 square feet is located below grade. Although the building is partially two-stories, it does not contain an elevator. However, in order to comply with the Americans with Disabilities Act of 1990, 42 U.S.C. 12101, et seq., a series of electric lifts were installed in the building. The subject property has in excess of 200 parking spaces.

The subject property is located in Cranford Township's ROI – Research, Office and Industrial zoning district with permitted uses that include business, administrative, executive and professional offices, industrial and manufacturing uses, hotels and motels, research laboratories, warehouse, child-care centers and essential services. Fitness centers are not specifically identified under the ROI zoning ordinance as a permitted, conditional or accessory uses. Thus, operation of the subject property as an office building is a legal conforming use, and operation of a fitness center in the building appears to be a nonconforming, legally permitted use. The subject property is located in the X Flood Hazard Zone, denoting an area of minimal flooding risk.

As of the valuation dates, the subject property was partially occupied by two principal tenants. Approximately 41,150 square feet was occupied by Registrar & Transfer Company, as office area, and approximately 14,166 square feet was occupied by Tone Fitness LLC, as a fitness center. In addition, approximately 5,858 square feet was leased for storage by tenants who occupied office space in the Cranford Business Park, and was occupied by plaintiff for its own storage. This resulted in approximately 11,086 square feet remaining vacant during the relevant valuation dates.

In 2009, the fitness center was completely renovated by Tone Fitness LLC. The fitness center area consists of rubber tile and carpet flooring, a combination of elevated acoustical tile and

3

exposed ceilings, recessed fluorescent and induction high bay lighting, men's and women's locker rooms and showers, a sauna, private tanning rooms, a dance room, a room for childcare, a mezzanine area for treadmills and an open gym layout.

Plaintiff timely filed Complaints directly with the Tax Court challenging the 2009, 2010, 2011, 2012 and 2013 tax year assessments on the subject property. The matters were tried to conclusion over several days.

During trial, plaintiff and defendant each offered testimony from State of New Jersey certified general real estate appraisers, who were accepted by the court, without objection, as experts in the field of property valuation. Each appraiser prepared an appraisal report expressing an opinion of the true market value of the subject property as of the October 1, 2008, October 1, 2009, October 1, 2010, October 1, 2011 and October 1, 2012 valuation dates.

The appraisers offered their opinions that the subject property had a true market value as follows:

|  | 10/1/2008 | 10/1/2009 | 10/1/2010 | 10/1/2011 | 10/1/2012 |
|---|---|---|---|---|---|
| Plaintiff's appraiser | $6,300,000 | $5,900,000 | $5,700,000 | $5,900,000 | $5,600,000 |
| Defendant's appraiser | $7,810,000 | $7,430,000 | $7,710,000 | $7,925,000 | $7,590,000 |

## II.  Conclusions of Law

### a.  Presumption of Validity

"Original assessments and judgments of county boards of taxation are entitled to a presumption of validity." MSGW Real Estate Fund, LLC v. Borough of Mountain Lakes, 18 N.J. Tax 364, 373 (Tax 1998). "Based on this presumption, the appealing taxpayer has the burden of proving that the assessment is erroneous." Pantasote Co. v. City of Passaic, 100 N.J. 408, 413 (1985) (citing Riverview Gardens v. North Arlington Borough, 9 N.J. 167, 174 (1952)). "The presumption of correctness. . . stands, until sufficient competent evidence to the contrary is

adduced." Little Egg Harbor Township v. Bonsangue, 316 N.J. Super. 271, 285-86 (App. Div. 1998). A taxpayer can only rebut the presumption by introducing "cogent evidence" of true value. That is, evidence "definite, positive and certain in quality and quantity to overcome the presumption." Aetna Life Ins. Co. v. Newark City, 10 N.J. 99, 105 (1952). Thus, at the close of plaintiff's proofs, the court must be presented with evidence that raises a "debatable question as to the validity of the assessment." MSGW Real Estate Fund, LLC, supra, 18 N.J. Tax at 376.

In evaluating whether the evidence presented meets the "cogent evidence" standard, the court "must accept such evidence as true and accord the plaintiff all legitimate inferences which can be deduced from the evidence." Id. at 376 (citing Brill v. Guardian Life Insurance Co. of America, 142 N.J. 520 (1995)). The evidence presented, when viewed under the Brill standard "must be 'sufficient to determine the value of the property under appeal, thereby establishing the existence of a debatable question as to the correctness of the assessment.'" West Colonial Enters, LLC v. City of East Orange, 20 N.J. Tax 576, 579 (Tax 2003) (quoting Lenal Properties, Inc. v. City of Jersey City, 18 N.J. Tax 405, 408 (Tax 1999), aff'd, 18 N.J. Tax 658 (App. Div. 2000), certif. denied, 165 N.J. 488 (2000)). "Only after the presumption is overcome with sufficient evidence. . . must the court 'appraise the testimony, make a determination of true value and fix the assessment.'" Greenblatt v. Englewood City, 26 N.J. Tax 41, 52 (Tax 2011) (quoting Rodwood Gardens, Inc. v. City of Summit, 188 N.J. Super. 34, 38-39 (App. Div. 1982)). Hence, even in the absence of a motion to dismiss under R. 4:37-2(b), the court is nonetheless required to determine if the plaintiff has overcome the presumption of validity. If the court independently concludes that plaintiff has not carried the requisite burden, dismissal of the action is warranted under R. 4:40-1 and the trial court need not engage in an evaluation of the evidence to make an independent determination of value.

According plaintiff all reasonable and legitimate inferences which can be deduced from the evidence presented, the court concludes that plaintiff produced cogent evidence sufficient to overcome the presumption of validity. If accepted as true, the opinions of plaintiff's appraiser and the facts upon which he relied raise debatable questions regarding the correctness of the local property tax assessment on the subject property for the 2009, 2010, 2011, 2012 and 2013 tax years.

However, concluding that the presumption of validity has been overcome does not equate to a finding by the court that a local property tax assessment is erroneous. Once the presumption has been overcome, "the court must then turn to a consideration of the evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence." Ford Motor Co. v. Township of Edison, 127 N.J. 290, 312 (1992). The court must be mindful that "although there may have been enough evidence [presented] to overcome the presumption of correctness at the close of plaintiff's case-in-chief, the burden of proof remain[s] on the taxpayer. . . to demonstrate that the judgment [or local property tax assessment] under review was incorrect." Id. at 314-15 (citing Pantasote Co., supra, 100 N.J. at 413).

b.  Highest and Best Use

In the court's pursuit to determine the true market value of the subject property, consideration must be given to that price which a hypothetical buyer would pay a hypothetical seller, neither of which are constrained to purchase or sell the property, as of October 1 of the pretax year. See Petrizzo v. Edgewater, 2 N.J. Tax 197, 200 (Tax 1981); Genola Ventures v. Shrewsbury Borough, 2 N.J. Tax 541, 551 (Tax 1981). An indispensable element to the process of property valuation and to the determination of a property's true market value is discerning its highest and best use. Ford Motor Co. v. Township of Edison, 10 N.J. Tax 153, 161 (Tax 1988), aff'd o.b., 12 N.J. Tax 244 (App. Div. 1990), aff'd, 127 N.J. 290 (1992). See also General Motors Corp. v. City of Linden, 22 N.J. Tax 95, 107 (Tax 2005). "For local property tax assessment

6

purposes, property must be valued at its highest and best use." Entenmann's Inc. v. Totowa Borough, 18 N.J. Tax 540, 545 (Tax 2000). Thus, the highest and best use analysis is often referred to as "the first and most important step in the valuation process." Ford Motor Co., supra, 10 N.J. Tax at 161.

The phrase highest and best use is defined as follows:

> The reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, financially feasible, and that results in the highest value. . . Alternatively, the probable use of land or improved property – specific with respect to the user and timing of the use – that is adequately supported and results in the highest present value.
>
> [Appraisal Institute, The Dictionary of Real Estate Appraisal (5th ed. 2010).]

Thus, the highest and best use analysis comprises the "sequential consideration of the following four criteria, determining whether the use of the subject property is: 1) legally permissible; 2) physically possible; 3) financially feasible; and 4) maximally productive." Clemente v. Township of South Hackensack, 27 N.J. Tax 255, 267-269 (Tax 2013), aff'd, 28 N.J. Tax 337 (App. Div. 2015). See also County of Monmouth v. Hilton, 334 N.J. Super. 582, 588 (App. Div. 2000).

Here, plaintiff's appraiser concluded that the "As Vacant" highest and best use of the subject property would be to hold it for development with an office building, when economic conditions improved. Conversely, defendant's appraiser concluded that the "As Vacant" highest and best use was to develop the subject property with an office building. However, because the subject property is currently developed with a one and part two-story office/flex/warehouse/industrial building, both appraisers concluded that continued use of the subject property represents its highest and best use "As Improved."

c.  Methodology

"There is no single determinative approach to the valuation of real property." 125 Monitor Street LLC v. City of Jersey City, 21 N.J. Tax 232, 237-238 (Tax 2004) (citing Samuel Hird & Sons, Inc. v. City of Garfield, 87 N.J. Super. 65, 72 (App. Div. 1965)); ITT Continental Baking Co. v. East Brunswick Township, 1 N.J. Tax 244, 251 (Tax 1980).  "There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income and cost." Brown v. Borough of Glen Rock, 19 N.J. Tax 366, 376 (App. Div. 2001), certif. denied, 168 N.J. 291 (2001) (internal citation omitted)).  The "decision as to which valuation approach should predominate depends upon the facts of the particular case and the reaction to these facts by the experts." Coca-Cola Bottling Co. of New York v. Neptune Township, 8 N.J. Tax 169, 176 (Tax 1986) (citing New Brunswick v. Tax Appeals Div., 39 N.J. 537 (1963)).  See also WCI-Westinghouse, Inc. v. Edison Township, 7 N.J. Tax, 610, 619 (Tax 1985), aff'd, 9 N.J. Tax 86 (App. Div. 1986).

Here, both appraisers relied on the income capitalization approach to derive an opinion of market value for the subject property.  When a property is income producing, the income capitalization approach is the favored method for determining the estimated value of that property. Parkway Village Apartments Co. v. Township of Cranford, 8 N.J. Tax 430 (Tax 1985), aff'd, 9 N.J. Tax 199 (App. Div. 1986), rev'd on other grounds, 108 N.J. 266 (1987); Helmsley v. Borough of Fort Lee, 78 N.J. 200 (1978); Hull Junction Holding Corp. v. Borough of Princeton, 16 N.J. Tax 68, 79 (Tax 1996).  "The income capitalization approach to value consists of methods, techniques, and mathematical procedures that an appraiser uses to analyze a property's capacity to generate benefits (i.e., usually the monetary benefits of income and reversion) and convert these benefits into an indication of present value." Appraisal Institute, The Appraisal of Real Estate, 439 (14th

8

ed. 2013).  As Judge Hopkins succinctly stated, in valuing a property employing the income-capitalization approach:

> the gross rental value of the property is estimated.  From the estimated gross rental there is deducted a factor for possible vacancies and collection losses.  This results in effective gross income.  Then all the expenses involved in running the property are subtracted, resulting in net income.  Net income is the money which an investor could expect to receive through an investment in the property.  It is computed into a value by means of a capitalization rate which embodies consideration of capital cost, remaining economic life of the property, and the degree of risk involved.
>
> [Lamm Associates v. West Caldwell Bor., 1 N.J. Tax 373, 377 (Tax 1980).]

Expressed as a formula, the income capitalization approach can be summarized as follows:

> Market Rent
> x     Leasable Square Footage
> Potential Gross Income
>
> -     Vacancy and Collection Losses
> Effective Gross Income
>
> -     Operating Expenses
> Net Operating Income
>
> ÷     Capitalization Rate
> Market Value of Property

Thus, central to the income capitalization approach is "the determination of the economic rent, also known as the 'market rent' or 'fair rental value.'" Parkway Village Apartments, supra, 108 N.J. at 270; see also New Brunswick v. State Div. of Tax Appeals, 39 N.J. 537 (1963).

      1.  Market Rent

The term market rent refers to "the most probable rent that a property should bring in a competitive and open market reflecting all conditions and restrictions of the lease agreement, including permitted uses, use restrictions, expense obligations, term, concessions, renewal and purchase options and tenant improvements." The Dictionary of Real Estate Appraisal, supra, at

121-22. The market rent attributable to a property may differ substantially from the actual rent derived on a property, which may be below market rates. Parkview Village Assocs. v. Borough of Collingswood, 62 N.J. 21, 29-30 (1972). However, "this does not mean that the actual rent is to be disregarded. . . 'in determining what is fair rental income, the actual rental income, while not controlling, is an element to be considered.'" McCrory Stores Corp. v. Asbury Park, 89 N.J. Super. 234, 243 (App. Div. 1965) (quoting Somers v. City of Meriden, 174 A. 184, 186 (Sup. Ct. Err. 1934)). See also Parkview Village Assocs., supra, 62 N.J. at 30 (concluding that "actual income is a significant probative factor in the inquiry as to economic income").

Here, the principal difference between the appraisers' opinions of market value centered on how the fitness center in the subject property should be valued. In plaintiff's appraiser's opinion, "I am valuing an office building," thus, "[i]f I grossed up that net lease [the fitness center], it really comes at about the same rental range as if it was appraised using pure office leases since it [is] basically is office space used as a gym." Thus, plaintiff's appraiser identified thirty-seven office leases he considered reflective of the market rent as of the valuation dates. In contrast, defendant's appraiser divided the building into two distinct areas: (i) 58,094 square feet of "finished office space, including the warehouse/storage area"; and (ii) 14,166 square feet of "gym space." In defendant's appraiser's opinion, the subject property has two distinct uses, as an office building and as an "office building with a gym use." Thus, defendant's appraiser identified sixteen office leases and seven fitness center leases he considered reflective of the market rent as of the valuation dates.

Both appraisers' analyses began with an examination of the rent rolls and leases for the subject property. Their investigation revealed that during the tax years at issue five leases were entered into for portions of the building: (1) a February 2009 gross lease for 14,835 square feet of office area, at an initial base rent of $20.00 per square foot; (2) a January 2009 net lease for 14,166

square feet, as a fitness center, at an initial base rent of $10.51 per square foot;[2] (3) an April 2011 gross lease for 26,135 square feet of office area, at an initial base rent of $17.50 per square foot; (4) a May 2011 gross lease for 528 square feet of unfinished warehouse area, with rent of $8.52 per square foot; and (5) an April 2006 gross lease for 484 square feet of unfinished warehouse area, with rent of $8.93 per square foot.

### A. Plaintiff's Appraiser

In the opinion of plaintiff's appraiser, the subject property is a Class B/C property located in the "Garden State/West Union County" sub-market. Based on his analysis of absorption rates and vacancy statistics, published in the REIS Office Market Report for the 3rd quarter 2008 through 3rd quarter 2012, he concluded that the health of the subject property's sub-market was declining during the tax years at issue.[3] Plaintiff's appraiser conducted a "peer group analysis" to identify competitors in the marketplace for the subject property, which he identified as other Mack-Cali office buildings in the Cranford Business Park, a Mack-Cali office building in Clark Township and an office building in Clark Township.

Plaintiff's appraiser reviewed Mack-Cali's rent rolls and "bible sheets" or lease abstracts to locate competitive and comparable leases in the immediate sub-market. In order to "verify the accuracy" of the "bible sheets" and the information contained therein, plaintiff's appraiser spoke with the leasing broker involved in each of the transactions. Ultimately, plaintiff's appraiser identified thirty-seven office leases he considered reflective of the market rent as of the valuation dates. Although fifteen of the leases identified by plaintiff's appraiser were lease renewals, in his

---

[2] Conflicting evidence was presented during trial regarding the rent attributable to the fitness center. Plaintiff's appraiser expressed that the fitness center's base rent was $9.34 per square foot, with an average effective rent of $10.22 per square foot over the life of the lease. Defendant's appraiser expressed that the fitness center's base rent was $10.51, but did not express the average effective rent over the life of the lease.

[3] REIS is a respected and well-known commercial real estate data collection and market analysis firm. The data collected is commercially available, widely circulated and frequently relied upon by professionals in the real estate appraisal field.

11

opinion, the lease renewals were "renegotiated at market [rate] with Mack-Cali." In determining the effective rent of the thirty-seven leases, plaintiff's appraiser computed the average rent of the lesser of: (i) the lease term, or (ii) the rent for the first five years of the lease, accounting for any free rent provided by the landlord. See First Republic Corp. of America v. East Newark Borough, 16 N.J. Tax 568, 578 (1997) (concluding that the technique of averaging rents payable over the life of a lease is "consistent with sound appraisal principles.")

The thirty-seven leases selected by plaintiff's appraiser were all gross leases, where the tenant was responsible for its own electric charges. According to plaintiff's appraiser, gross leases are "typical of the market for B/C office buildings and it's typical of actually every single building within the office park, that I am aware of, are gross plus tenant electric. . ." Thus, in order to reconcile the differing lease types and to develop a consistent gross potential income to which a single capitalization rate could be applied, plaintiff's appraiser opined that it is "most accurate" to gross up the net leases. Accord Harrison Realty Corp. v. Harrison Town, 16 N.J. Tax 375, 382 (Tax 1997) (concluding that "[t]he expert's approach to converting the leases from gross to net by deducting an amount equal to the tax stop is eminently sound"); American Cyanamid Co. v. Township of Wayne, 17 N.J. Tax 542, 572 (Tax 1998), aff'd, 19 N.J. Tax 46 (App. Div. 2000).

Plaintiff's appraiser then applied a series of upward and downward adjustments to the leases for quality/condition (ranging from 5% to 10%), and economic characteristics (ranging from 5% to 20%). The quality/condition adjustments were intended to account for differences in physical characteristics of the properties, including construction, amenities, functional utility, effective age and physical condition. Plaintiff's appraiser made a negative adjustment of 5% to two of the competitive leases to account for differences in size. Plaintiff's appraiser made no time or location adjustments. Plaintiff's economic characteristic adjustment accounted for rent concessions and excessive tenant improvement allowances. In determining whether a tenant

12

improvement allowance was excessive, plaintiff's appraiser analyzed the comparable and competitive leases, discerning that a "$15.00 per square foot. . . [tenant improvement allowance was] typical [for a] 60-month term ($0.25 per square foot per month) for new leases." Conversely, for lease renewals plaintiff's appraiser determined that only a $5.00 per square foot ($0.08 per square foot per month) tenant improvement allowance was customary in the marketplace. The range, per square foot, of unadjusted rents and adjusted rents for the thirty-seven office leases are set forth as follows:

| Tax Year | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|
| Unadjusted Rents | $18.00 - $26.10 | $19.47 - $23.97 | $21.00 - $25.67 | $17.80 - $22.80 | $19.60 - $23.36 |
| Adjusted rents | $17.10 - $23.42 | $18.79 - $22.77 | $18.70 - $22.32 | $16.80 - $24.20 | $15.83 - $23.36 |

Based on the foregoing analysis, plaintiff's appraiser concluded a market rent, per square foot, for the office area as follows:

| Tax Year | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|
| Market rent | $21.00 | $21.00 | $20.00 | $20.00 | $19.00 |

B. Defendant's Appraiser

In defendant's appraiser's opinion, the competitive and comparable market for the subject property was more sprawling, including Cranford, Clark, Iselin, Springfield and Berkeley Heights. Defendant's appraiser identified sixteen office leases that he considered reflective of the market rent as of the valuation dates. Five of the office leases identified were deemed competitive and comparable for more than one tax year. Fifteen of the leases offered by defendant's appraiser were gross leases, and one was a net lease.

Defendant's appraiser applied adjustments to the comparable office leases, accounting for differences in location (5%), quality/condition (5% - 10%) and physical characteristics (5%). In defendant's appraiser's opinion, a gross lease arrangement for the subject property's office space was more reasonable, thus he adjusted three of the comparable office leases upward by 5%, 10%

and 15%, respectively, to account for the landlord's responsibility for operational expenses. Defendant's appraiser adjusted the base rents downward to account for rent concessions. Defendant's appraiser's gross adjustment amounts ranged from -20% to 15%. The range of unadjusted rents and adjusted rents, per square foot, for the sixteen office leases are set forth as follows:

| Tax Year | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|
| Unadjusted Rents | $18.50 - $24.00 | $19.57 - $24.50 | $19.57 - $25.97 | $21.50 - $26.51 | $19.05 - $26.51 |
| Adjusted rents | $20.90 - $24.15 | $19.53 - $22.55 | $19.21 - $21.74 | $19.55 - $22.53 | $18.10 - $22.53 |

Based on the foregoing analysis, defendant's appraiser opined office market rents, per square foot, as follows:

| Tax Year | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|
| Market rent | $22.50 | $21.00 | $21.00 | $21.50 | $20.50 |

### C. Conclusion

Comparing and contrasting the office market rents proffered by plaintiff's and defendant's appraisers discloses a very close range of market rents. However, the court finds the market rents offered by plaintiff's appraiser to be more credible. The primary reason for this determination is that thirty-four of plaintiff's appraiser's competitive and comparable leases were located within the Cranford Business Park and bear an effective date in close proximity to each valuation date. In contrast, only eight of defendant's appraiser's competitive and comparable leases were situated in the Cranford Business Park. Thus, more than 55% of defendant's appraiser's comparable and competitive leases were located outside of the Cranford Business Park environment. More importantly, of the eight leases within the Cranford Business Park, defendant's appraiser was only able to verify the accuracy of one lease with a transaction participant. Defendant's appraiser explained that the source of information for his Cranford Business Park comparable leases was entirely premised on Chapter 91 (N.J.S.A. 54:4-34) responses furnished by Mack-Cali to Cranford

14

Township. Defendant's appraiser explained that, in certain instances, Mack-Cali provided "leasing status reports" and "bible sheets," however in other cases, they provided only rent rolls or redacted rent rolls. Thus, defendant's appraiser was unable to verify the accuracy of much of the lease information for the Cranford Business Park comparable leases he relied on with any transaction participants. Moreover, defendant's appraiser was unable to ascertain whether the lessor or lessee were unusually motivated in entering into any of the lease agreements. Defendant's appraiser's inability to verify the integrity of the lease information raises substantive questions regarding the accuracy of the information. This can best be exemplified by two identical comparable leases identified by both plaintiff's appraiser and defendant's appraiser. Plaintiff's appraiser and defendant's appraiser both identified comparable leases between: (i) Mack-Cali and Medi-Corp, Inc., commencing February 2009; and (ii) 14 Commerce Realty and Monumental Life Insurance, commencing March 2012. For the Medi-Corp, Inc. lease, plaintiff's appraiser reported an effective rent of $23.68 per square foot, while defendant's appraiser reported an effective rent of $24.50. Similarly, for the Monumental Life Insurance lease, plaintiff's appraiser reported an effective rent of $22.23 per square foot, while defendant's appraiser reported an effective rent of $20.00 per square foot, with "no step ups." The disparity that exists between the lease information reported by plaintiff's appraiser and defendant's appraiser highlights the importance of verifying the accuracy of lease information with transaction participants, a critical element to producing a credible determination of market rent.

Thus, the court accepts plaintiff's proffered office market rents and stabilizes the rents as follows: $21.00 for 2009 tax year; $21.00 for 2010 tax year; $20.00 for 2011 tax year; $20.00 for 2012 tax year; and $19.00 for 2013 tax year.

15

D. Fitness Center

As stated above, the building was initially designed for use as an office, showroom, warehouse and distribution center. In the mid-1980's, all or a substantial portion of the showroom was converted into a fitness center. For the ensuing twenty-five to thirty years, a fitness center has occupied all or a portion of the former showroom in the building.

The testimony adduced during trial demonstrates that the area occupied by the fitness center does not resemble general office space. The interior finishes of the fitness center are not commensurate with the interior finishes of general office space. The fitness center has significantly expanded and exposed ceilings, rubber floor matting and consists of an open floorplan. The fitness center contains a "highly finished gym area," including men's and women's locker rooms, showers, saunas, private tanning rooms, a dance room, a child care room and a mezzanine area. In contrast, the subject property's general office space has low acoustical tile ceilings, carpeted flooring, and interior sheetrock demising walls.

A core principle of property valuation is that a property must be valued in the condition that existed as of the valuation date. "Property to be assessed, whatever may be its character, is to be taken and valued in the actual condition in which the owner holds it." Highview Estates v. Borough of Englewood Cliffs, 6 N.J. Tax 194, 200 (Tax 1983) (citing Trustees of Stevens Institute of Technology v. State Bd. of Taxes & Assessment, 105 N.J.L. 99, 101 (Sup. Ct. 1982), aff'd, 105 N.J.L. 655 (E. & A. 1929)). Moreover, property "valuation should have some relationship to [the] reality" that existed on the property as of the valuation dates. Hackensack Water Co. v. Old Tappan, 77 N.J. 208, 214 (1978). Here, as of each of the valuation dates, approximately 14,166 square feet of the building functioned as a fitness center and had operated as a fitness center for the preceding twenty-five to thirty years.

When a party advocates an alternate use of a property, that party bears the burden, by a fair preponderance of the evidence, of presenting evidence to support its position. Berkeley Development Co. v. Berkeley Heights Twp., 2 N.J. Tax 438 (Tax 1981); see also Penns Grove Gardens, Ltd. v. Borough of Penns Grove, 18 N.J. Tax 253, 263 (Tax 1999); Ford Motor Corp., supra, 10 N.J. Tax at 167; Clemente, supra, 27 N.J. Tax at 269. Here, plaintiff's appraiser's justification for valuing the fitness center as office space was entirely subjective. Although he opined that the fitness center was ostensibly office space and could be converted to office use, no evidence was presented that converting the fitness center to office space would be financially feasible. The modification or alteration of improvements "must add at least as much value to the property as it costs" in order to be financially feasible, so that the post-alteration value, less alteration costs must be greater than or equal to "the value of the property as is." The Appraisal of Real Estate, supra, at 346-47.

The fitness center comprises approximately twenty percent of the leased area of the building. Moreover, a fitness center has operated in all or a portion of the former showroom in the building for approximately twenty-five to thirty years. Based on the physical characteristics, as evidenced by the photographs and testimony of plaintiff's appraiser and defendant's appraiser, the court concludes that the subject property is a mixture of offices and a fitness center. Thus, the court rejects plaintiff's appraiser's valuation of the fitness center as an office and concludes that the fitness center should be valued as a fitness center.

In valuing the fitness center, defendant's appraiser identified seven fitness center leases he considered competitive and reflective of market rent. All seven fitness center leases were net lease agreements.

Defendant's appraiser applied adjustments to the comparable fitness center leases, accounting for differences in location (5%), quality/condition (5% - 10%) and physical

characteristics (5% - 15%). Defendant's appraiser's gross adjustment amounts ranged from -20% to 25%. The range of unadjusted rents and adjusted net rents, per square foot, for the seven fitness center leases are set forth as follows:

| Tax Year | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|
| Unadjusted rents | $6.22 - $16.00 | $7.39 - $17.00 | $7.39 - $17.00 | $7.39 - $17.00 | $9.50 - $19.00 |
| Adjusted rents | $7.78 - $12.80 | $9.00 - $13.60 | $9.24 - $13.60 | $9.24 - $13.60 | $9.98 - $15.20 |

Based on the foregoing analysis, defendant's appraiser opined that the market rent, per square foot, for the fitness center is as follows:

| Tax Year | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|
| Market rent | $10.00 net | $11.00 net | $11.00 net | $11.00 net | $11.50 net |

The court accepts defendant's appraiser's proffered fitness center market rent and stabilizes the net rent as follows: $10.00 for the 2009 tax year; $11.00 for the 2010, 2011 and 2012 tax years; and $11.50 for the 2013 tax year.

### 2. Vacancy and Collection Loss

Plaintiff and defendant stipulated that the vacancy and collection loss factor to be applied to the Potential Gross Income of the subject property shall be 15%.

### 3. Management and Leasing Commissions

Plaintiff and defendant stipulated to management fees of 3% of the Effective Gross Income and leasing commissions of 5% of the Effective Gross Income.

### 4. Building Size

Plaintiff and defendant stipulated that the gross leasable area of the building was 72,260 square feet.

### 5. Operating Expenses

Due to the hybrid nature of the income stream for the subject property, the court concludes that plaintiff's appraiser's gross office market rent, and defendant's appraiser's net fitness center

18

market rent, are credible evidence of market rent. Thus, the court's inquiry turns to examination of the stabilized expenses and costs incurred by a property owner receiving modified gross rents and net rents.

In a net lease, the landlord is fully reimbursed for the real estate taxes and operating expenses attributed to the area of the improvement that is subject to the net lease. Thus, under a net lease, the landlord is responsible only "for structural maintenance, building reserves, and management." The Dictionary of Real Estate Appraisal, supra, at 134. Accordingly, there are very few expenses attributable to the landlord, unlike a gross lease where the landlord is responsible for the real estate taxes and "all of the property's operating and fixed expenses." The Dictionary of Real Estate Appraisal, supra, at 91.

Here, the principle difference between plaintiff's appraiser's and defendant's appraiser's operating expenses results from the inclusion and exclusion of the 14,166 square feet of leasable area attributable to the fitness center. Plaintiff's appraiser treated the fitness center as office space, leased on a gross basis, resulting in the computation of operating expenses on the gross 72,260 square feet of leasable area. In contrast, defendant's appraiser treated the operating expenses for the office space and fitness center differently, recognizing that the fitness center is leased on a net basis, where the tenant bears responsibility for operational expenses, and the office space is leased on a gross basis, where the tenant bears little responsibility for operational expenses. Thus, defendant's appraiser attributed operational expenses to the 58,094 square feet of office space leased on a gross basis (72,260 leasable area – 14,166 fitness center = 58,094 office space).

Both appraisers initially analyzed the historical operating expenses of the subject property. Plaintiff's appraiser concluded that the insurance, utility, repairs/maintenance, janitorial and general administrative costs ranged from $3.23 to $4.48 per square foot for the subject property. Defendant's appraiser observed that the historical operating expenses for the subject property were

19

approximately $3.95 per square foot, consisting of insurance costs of between $0.24 and $0.26, per square foot; utility expenses of $1.00 per square foot, for the 58,094 square feet occupied as office space; general and administrative expenses of $0.20 per square foot; maintenance and repair expenses of $2.50 per square foot; and no janitorial costs.

In plaintiff's appraiser's opinion, due to the subject property's vacancy and differing lease terms, "we do not have stabilized building" and a "stabilized operating expense history." Thus, plaintiff's appraiser looked to the marketplace to discern the "typical operating expenses to a typical office building in the market." Plaintiff's appraiser examined operating expenses of other buildings in the marketplace of similar quality and condition to subject property and studies published by the Building Owners and Management Association ("BOMA"). In addition, plaintiff's appraiser examined expenses of one Class A building and four Class B office buildings. The Class A building was located in the Cranford Business Park, three of the Class B buildings were located in Somerset County, and one Class B Building was located in Clark Township. Based on the foregoing analysis, plaintiff's appraiser determined stabilized operating expenses, as of each valuation date, of the following: (i) insurance at $0.20 per square foot; (ii) utilities at $1.50 per square foot; (iii) repairs/maintenance at $2.00 per square foot; (iv) cleaning/janitorial at $1.25 per square foot; and (v) general/administrative $0.50 per square foot.

Defendant's appraiser examined Institute of Real Estate Management ("IREM") surveys and "statements of competing buildings within the business park." He determined stabilized operating expenses as follows: (i) insurance at $0.24 per square foot; (ii) utilities at $1.00 per square foot for the 2008, 2009 and 2010 tax years and $1.25 per square foot for the 2011 and 2012 tax years; (iii) repairs/maintenance and cleaning/janitorial at $2.50 per square foot; and (iv) general/administrative $0.20 per square foot.

Plaintiff's appraiser stabilized replacement reserves at 1% of Effective Gross Income or approximately $0.16 to $0.18 per square foot. Plaintiff's appraiser analyzed office market surveys and the reported prices of replacement costs, to compute his replacement reserve percentage. Plaintiff's appraisal report reproduced copies of published PWC office market studies for the 3rd quarter 2008 through 3rd quarter 2013.[4] In contrast, defendant's appraiser stabilized replacement reserves at $0.40 per square foot. Defendant's appraiser testified that there was "no historical [replacement reserve] data for the subject property," so he examined replacement costs and different "studies like BOMA, IREM and Marshall & Swift" and "felt $0.40 was adequate."

Both appraisers agreed that tenant improvement allowances were common in the subject property's Class B/C office/flex/warehouse sub-market. It is well-settled that in "certain real estate markets, space is rented to a new tenant only after substantial interior improvements are made. If this work is performed at the landlord's expense and is required to achieve market rent, the expense of these improvements should be included in the reconstructed operating statement as part of the replacement allowance." Hull Junction Holding Corp., supra, 16 N.J. Tax at 106 (citing Appraisal Institute, The Appraisal of Real Estate, 450 (10th ed. 1992)). Thus, in computing his tenant improvement cost allowance plaintiff's appraiser reviewed surveys of market participants and competitive leases in the marketplace to discern the range of values in new leases and lease renewals. Based on his review of competitive leases, plaintiff's appraiser discerned that tenant improvement allowances ranged from $0.00 to $39.00 per square foot for new leases, and from $0.00 to $29.76 per square foot for lease renewals. His review of market participant surveys revealed a range of $10.00 to $30.00 per square foot, for new leases, and range of $0.00 to $15.00 per square foot, for lease renewals. Thus, plaintiff's appraiser assumed a new lease tenant

---

[4] PWC is a respected and well-known financial analysis firm. The study data is commercially available, widely circulated and frequently relied upon by professionals in the real estate appraisal field.

21

improvement allowance of $15.00 per square foot and renewal lease tenant improvement allowance of $5.00 per square foot. Plaintiff's appraiser then reviewed PWC's renewal probability surveys for the 3rd quarter 2008 through the 3rd quarter 2013. His analysis of these surveys disclosed the likelihood of lease renewal ranged from 60% to 75%. Based on these rates, plaintiff's appraiser calculated the weighted average cost of the new lease and renewal lease tenant improvement allowance to be $8.50 per square foot. He further assumed an average lease term of five years to conclude a tenant improvement cost of $1.70 per square foot.

Defendant's appraiser testified that he reviewed the competitive leases referenced in his appraisal report to determine the tenant improvement allowance. Defendant's appraiser assumed that the new leases and lease renewals should be "evenly split" and thus, concluded a tenant improvement cost of $1.65 per square foot. Defendant's appraiser applied the tenant improvement allowance to the 58,094 square feet of the building occupied as office space. No tenant improvement allowance was afforded to the fitness center as that space was leased on a net basis.

With one exception, the court finds plaintiff's appraiser's stabilized operating expenses to be a more accurate representation of market expenses. Although defendant's appraisal report and testimony disclosed that he examined IREM and BOMA surveys, and consulted the Marshall & Swift cost estimator tables, none of the surveys, studies or cost estimates were contained in or annexed to defendant's appraisal report. Moreover, neither defendant's appraisal report, nor his testimony disclosed with any particularity the surveys, reports or studies that he relied upon to compute his stabilized expenses. For instance, defendant's appraisal report states that "IREM's range of [insurance expenses was] $.23 to $.30/sf," however defendant's appraiser did not identify the report, geographic region, property type, or time period for the study that he consulted. Moreover, defendant's maintenance and repair factor was apparently discerned by defendant's appraiser's review of expense statements of competitive properties. However, defendant's

22

appraiser did not disclose what properties he identified as competitive to the subject property and did not furnish the court with copies of any of the expense statements he examined. In contrast, plaintiff's appraiser's stabilized operating expenses were supported by plaintiff's appraiser's analysis of the expense statements of other competing buildings, which statements were reproduced by plaintiff's appraiser. Additionally, plaintiff's appraisal report reproduced the BOMA market participant expense survey information that contributed to his expense calculations. Plaintiff's appraiser further furnished the court with the PWC office market studies used to compute his replacement reserve allowance.

However, the court finds that the $1.50 per square foot utility expense factor employed by plaintiff's appraiser does not properly account for the subject property's use and physical composition. As observed by defendant's appraiser, based on his review of the subject property's historical expenses, the landlord incurred utility expenses of approximately $1.00 per square foot for the 58,094 square feet of the building occupied as office space. However, since the fitness center has and continues to operate under a net lease arrangement, the fitness center tenant is responsible for its own utilities or a pro-rata share of the total utilities of the building. Thus, the court accepts defendant's appraiser's $1.00 per square foot utility expense factor for the 2008, 2009 and 2010 tax year, and $1.25 per square foot utility expense factor for the 2011 and 2012 tax years.

More importantly, the court will apply the following stabilized expenses to only that portion of the building leased, on a gross basis, as offices: insurance, utilities, maintenance/repairs, cleaning/janitorial, and tenant improvement costs. The court will apply the general/administrative expenses to the gross leasable area of the building, as these expenses are generally incurred by the landlord regardless of whether an area is leased on a gross or net basis.

6. Capitalization

Direct capitalization is a "method used to convert an estimate of a single year's income expectancy into an indication of value in one direct step, either by dividing the net income estimate by an appropriate capitalization rate or by multiplying the income estimate by an appropriate factor." The Appraisal of Real Estate, supra, at 491. Thus, the capitalization rate is the device that converts net operating income into an estimate of property value.

Here, in deriving their overall capitalization rates, both plaintiff's appraiser and defendant's appraiser consulted investor surveys and employed the Band of Investment technique. The investor surveys are completed by market participants engaged in real estate financing transactions during given time periods. The surveys are compiled by analytical firms and trade associations and organized into categories and sub-categories, including geographic location, property type, size, grade, value, loan amount, etc. The Band of Investment technique "is a form of 'direct capitalization' which is used 'to convert a single year's income estimate into a value indication.' The technique includes both a mortgage and an equity component." Hull Junction Holding, supra, 16 N.J. Tax. at 80-81 (quoting Appraisal Institute, Appraisal of Real Estate, 467 (10th ed 1992)). In employing the "Band of Investment technique, it is incumbent upon the appraiser to support the various components of the capitalization rate analysis by furnishing 'reliable market data . . . to the court as the basis for the expert's opinion so that the court may evaluate the opinion.'" Id. at 82 (quoting Glen Wall Assocs. v. Township of Wall, 99 N.J. 265, 279-80 (1985)).

In arriving at their capitalization rates, both plaintiff's appraiser and defendant's appraiser reviewed the Korpacz/ PWC National Suburban Office Market surveys for the 3rd quarter 2008 through the 3rd quarter 2012. Plaintiff's appraiser and defendant's appraiser also both consulted the American Council of Life Insurers ("ACLI") Commercial Mortgage Commitments for the 3rd

quarter 2008 through 3rd quarter 2012 to gauge the market contract interest rates and loan-to-value ratios.

Plaintiff's appraiser also consulted the Viewpoint National Suburban Office survey for the years ending 2008, 2009, 2010, 2011 and 2012 and the Integra Realty Resources Financing Rate Survey, an investor survey prepared by plaintiff's company. However, neither the Viewpoint National Suburban Office survey, nor the Integra Realty Resources Financing Rate survey were annexed to plaintiff's appraisal report.

Defendant's appraiser also reviewed and considered competing investments' return rates. Specifically, defendant's appraiser consulted the 3rd quarter 2008 through 3rd quarter 2012 published interest rates for United States 1-year treasury bonds, 10-year treasury bonds, 30-year treasury bonds and corporate bonds bearing an Aaa and Baa rating.

For the 2009 tax year, plaintiff's appraiser and defendant's appraiser both assumed: (i) a 6.50% interest rate for the mortgage component; (ii) a 25-year mortgage amortization period; (iii) a 60% loan-to-value ratio; and (iv) a 9.00% equity dividend rate. The resulting overall capitalization rate for the 2009 tax year is: 8.46%. Plaintiff's appraiser rounded the capitalization rate to 8.50% and defendant's appraiser rounded it to 8.45%.

For the 2010 tax year, plaintiff's appraiser and defendant's appraiser both assumed: (i) a 25-year mortgage amortization period; and (ii) a 60% loan-to-value ratio. However, plaintiff's appraiser assumed a 7.50% interest rate and defendant's appraiser assumed a 7.00% interest rate. Moreover, plaintiff's appraiser assumed a 10.00% equity dividend rate and defendant's appraiser assumed a 7.50% equity dividend rate. The resulting overall capitalization rate for the 2010 tax year is: 9.32% for plaintiff, which plaintiff's appraiser rounded to 9.25%; and 8.09% for defendant, which defendant's appraiser rounded to 8.10%.

For the 2011 tax year, plaintiff's appraiser and defendant's appraiser both assumed a 25-year mortgage amortization period. However, plaintiff's appraiser assumed a 5.25% interest rate with a 55% loan-to-value ratio and defendant's appraiser assumed a 6.00% interest rate with a 60% loan-to-value ratio. Moreover, plaintiff's appraiser assumed a 10.00% equity dividend rate and defendant's appraiser assumed a 7.50% equity dividend rate. The resulting overall capitalization rate for the 2011 tax year is: 8.46% for plaintiff, which plaintiff's appraiser rounded to 8.50%; and 7.64% for defendant.

For the 2012 tax year, plaintiff's appraiser and defendant's appraiser both assumed a 25-year mortgage amortization period. However, plaintiff's appraiser assumed a 5.00% interest rate with a 55% loan-to value ratio and defendant's appraiser assumed a 5.50% interest rate with a 60% loan-to-value ratio. Moreover, plaintiff's appraiser assumed a 9.00% equity dividend rate and defendant's appraiser assumed a 7.50% equity dividend rate. The resulting overall capitalization rate for the 2012 tax year is: 7.91% for plaintiff, which plaintiff's appraiser rounded to 8.00%; and 7.42% for defendant.

For the 2013 tax year, plaintiff's appraiser and defendant's appraiser both assumed a 25-year mortgage amortization period. However, plaintiff's appraiser assumed a 4.00% interest rate with a 55% loan-to value ratio and defendant's appraiser assumed a 5.00% interest rate with a 60% loan-to-value ratio. Moreover, plaintiff's appraiser assumed a 9.00% equity dividend rate and defendant's appraiser assumed a 7.50% equity dividend rate. The resulting overall capitalization rate for the 2013 tax year is: 7.53% for plaintiff, that plaintiff's appraiser rounded to 7.50%; and 7.21% for defendant.

"[T]he Tax Court has accepted, and the Supreme Court has sanctioned, the use of data collected and published by the American Council of Life Insurance." Hull Junction Holding Corp., supra, 16 N.J. Tax at 82-83. "Relevant data is also collected and published by . . . Korpacz [PWC]

26

Real Estate Investor Survey." Id. at 83. By scrutinizing and "analyzing this data in toto, the court can make a reasoned determination as to the accuracy and reliability of the mortgage interest rates, mortgage constants, loan-to-value ratios, and equity dividend rates used by the appraisers." Ibid.

The court considered the testimony of plaintiff's appraiser and defendant's appraiser and has reviewed the supporting surveys, tables of information and mortgage/equity calculations and finds that defendant's appraiser's capitalization rates are more representative of the marketplace for the subject property, as of the applicable valuation dates. The base capitalization rate determined by defendant's appraiser for the tax years at issue is as follows: 8.45% for 2009, 8.10% for 2010, 7.64% for 2011, 7.42% for 2012 and 7.21% for 2013.

After computing their base capitalization rates, both plaintiff's appraiser and defendant's appraiser added or "loaded" a tax factor to each valuation year to derive their overall capitalization rates. The tax factor represents the real estate taxes payable by plaintiff arising from operation of the subject property. However, as stated above, the court has determined that 58,094 square feet of the building is occupied as offices, and leased on a gross basis. The remaining 14,166 square feet is occupied and used as a fitness center, and leased on a net basis. As stated above, under a net lease arrangement, the landlord is fully reimbursed for the real estate taxes and operating expenses attributable to the area subject to the net lease. Accordingly, there are no expenses borne by the landlord. In sharp contrast, under a gross lease, the landlord is responsible for the real estate taxes and operating expenses of the leased area. Therefore, the court rejects plaintiff's appraiser's tax factor computation that applies a real estate tax expense to the total 72,260 square feet of leasable area of the building. Instead, the court accepts defendant's appraiser's tax factor computation that allocates a real estate tax expense to only the 58,094 square feet occupied as offices under a gross lease arrangement.

27

For the reasons set forth above, the court finds the true value of the subject property under the income-capitalization approach to be: $6,637,978 for the 2009 tax year, $6,929,463 for the 2010 tax year, $ 6,707,771 for the 2011 tax year, $6,659,161 for the 2012 tax year and $6,311,865 for the 2013 tax year.

**2009 Tax Year**

INCOME:

| | | | |
|---|---|---|---|
| Office | $21.00 (Gross) | @ 58,094 sq. ft. | $1,219,974 |
| Fitness Center | $10.00 (Net) | @ 14,166 sq. ft. | $ 141,660 |
| TOTAL:POTENTIAL GROSS INCOME | | | $1,361,634 |
| LESS: Vacancy & Collection Loss | | @ 15% | ($ 204,245) |
| TOTAL: EFFECTIVE GROSS INCOME | | | $1,157,389 |

EXPENSES:

| | | | |
|---|---|---|---|
| Insurance | @ $0.20 x 58,094 sq. ft. | $ 11,619 | |
| Utilities | @ $1.00 x 58,094 sq. ft. | $ 58,094 | |
| Repairs/Maintenance | @ $2.00 x 58,094 sq. ft. | $116,188 | |
| Cleaning/Janitorial | @ $1.25 x 58,094 sq. ft. | $ 72,618 | |
| Tenant Improvement Costs | @ $1.70 x 58,094 sq. ft. | $ 98,760 | |
| General/Administrative | @ $0.50 x 72,260 sq. ft. | $ 36,130 | |
| Management | @ 3% of EGI | $ 34,722 | |
| Leasing Commissions | @ 5% of EGI | $ 57,869 | |
| Replacement Reserves | @ 1% of EGI | $ 11,574 | |
| TOTAL: EXPENSES | | | ($ 497,574) |

| | |
|---|---|
| NET OPERATING INCOME | $ 659,815 |

| | |
|---|---|
| Capitalization Rate | 8.45% |
| Plus: Effective Tax Rate | 1.49% |
| TOTAL CAPITALIZATION RATE | 9.94% |

| | |
|---|---|
| INDICATED VALUE | $6,637,978 |

28

**2010 Tax Year**

INCOME:

| | | | |
|---|---|---|---|
| Office | $21.00 (Gross) | @ 58,094 sq. ft. | $1,219,974 |
| Fitness Center | $11.00 (Net) | @ 14,166 sq. ft. | $ 155,826 |

TOTAL: POTENTIAL GROSS INCOME                                           $1,375,800
LESS: Vacancy & Collection Loss             @ 15%                ($ 206,370)
TOTAL: EFFECTIVE GROSS INCOME                        $1,169,430

EXPENSES:

| | | |
|---|---|---|
| Insurance | @ $0.20 x 58,094 sq. ft. | $ 11,619 |
| Utilities | @ $1.00 x 58,094 sq. ft. | $ 58,094 |
| Repairs/Maintenance | @ $2.00 x 58,094 sq. ft. | $116,188 |
| Cleaning/Janitorial | @ $1.25 x 58,094 sq. ft. | $ 72,618 |
| Tenant Improvement Costs | @ $1.70 x 58,094 sq. ft. | $ 98,760 |
| General/Administrative | @ $0.50 x 72,260 sq. ft. | $ 36,130 |
| Management | @ 3% of EGI | $ 35,083 |
| Leasing Commissions | @ 5% of EGI | $ 58,472 |
| Replacement Reserves | @ 1% of EGI | $ 11,694 |

TOTAL: EXPENSES                                                     ($ 498,658)

NET OPERATING INCOME                                        $ 670,772

| | |
|---|---|
| Capitalization Rate | 8.10% |
| Plus: Effective Tax Rate | 1.58% |
| TOTAL CAPITALIZATION RATE | 9.68% |

INDICATED VALUE                                             $6,929,463

**2011 Tax Year**

INCOME:

| | | | |
|---|---|---|---|
| Office | $20.00 (Gross) | @ 58,094 sq. ft. | $1,161,880 |
| Fitness Center | $11.00 (Net) | @ 14,166 sq. ft. | $ 155,826 |

TOTAL: POTENTIAL GROSS INCOME                                           $1,317,706
LESS: Vacancy & Collection Loss             @ 15%                ($ 197,656)
TOTAL: EFFECTIVE GROSS INCOME                        $1,120,050

EXPENSES:

| | | |
|---|---|---|
| Insurance | @ $0.20 x 58,094 sq. ft. | $ 11,619 |
| Utilities | @ $1.00 x 58,094 sq. ft. | $ 58,094 |
| Repairs/Maintenance | @ $2.00 x 58,094 sq. ft. | $116,188 |
| Cleaning/Janitorial | @ $1.25 x 58,094 sq. ft. | $ 72,618 |
| Tenant Improvement Costs | @ $1.70 x 58,094 sq. ft. | $ 98,760 |
| General/Administrative | @ $0.50 x 72,260 sq. ft. | $ 36,130 |
| Management | @ 3% of EGI | $ 33,602 |
| Leasing Commissions | @ 5% of EGI | $ 56,003 |
| Replacement Reserves | @ 1% of EGI | $ 11,201 |

TOTAL: EXPENSES                                                     ($ 494,215)

NET OPERATING INCOME                                        $ 625,835

| | |
|---|---|
| Capitalization Rate | 7.64% |
| Plus: Effective Tax Rate | 1.69% |
| TOTAL CAPITALIZATION RATE | 9.33% |

INDICATED VALUE                                             $6,707,771

**2012 Tax Year**

INCOME:

| | | | |
|---|---|---|---|
| Office | $20.00 (Gross) | @ 58,094 sq. ft. | $1,161,880 |
| Fitness Center | $11.00 (Net) | @ 14,166 sq. ft. | $  155,826 |
| TOTAL:POTENTIAL GROSS INCOME | | | $1,317,706 |
| LESS:   Vacancy & Collection Loss | | @ 15% | ($  197,656) |
| TOTAL: EFFECTIVE GROSS INCOME | | | $1,120,050 |

EXPENSES:

| | | |
|---|---|---|
| Insurance | @ $0.20 x 58,094 sq. ft. | $  11,619 |
| Utilities | @ $1.25 x 58,094 sq. ft. | $  72,618 |
| Repairs/Maintenance | @ $2.00 x 58,094 sq. ft. | $116,188 |
| Cleaning/Janitorial | @ $1.25 x 58,094 sq. ft. | $  72,618 |
| Tenant Improvement Costs | @ $1.70 x 58,094 sq. ft. | $  98,760 |
| General/Administrative | @ $0.50 x 72,260 sq. ft. | $  36,130 |
| Management | @ 3% of EGI | $  33,602 |
| Leasing Commissions | @ 5% of EGI | $  56,003 |
| Replacement Reserves | @ 1% of EGI | $  11,201 |
| TOTAL: EXPENSES | | ($  508,739) |

NET OPERATING INCOME                          $  611,311

| | |
|---|---|
| Capitalization Rate | 7.42% |
| Plus: Effective Tax Rate | 1.76% |
| TOTAL CAPITALIZATION RATE | 9.18% |

INDICATED VALUE                               $6,659,161

**2013 Tax Year**

INCOME:

| | | | |
|---|---|---|---|
| Office | $19.00 (Gross) | @ 58,094 sq. ft. | $1,103,786 |
| Fitness Center | $11.50 (Net) | @ 14,166 sq. ft. | $  162,909 |
| TOTAL:POTENTIAL GROSS INCOME | | | $1,266,695 |
| LESS:   Vacancy & Collection Loss | | @ 15% | ($  190,004) |
| TOTAL: EFFECTIVE GROSS INCOME | | | $1,076,691 |

EXPENSES:

| | | |
|---|---|---|
| Insurance | @ $0.20 x 58,094 sq. ft. | $  11,619 |
| Utilities | @ $1.25 x 58,094 sq. ft. | $  72,618 |
| Repairs/Maintenance | @ $2.00 x 58,094 sq. ft. | $116,188 |
| Cleaning/Janitorial | @ $1.25 x 58,094 sq. ft. | $  72,618 |
| Tenant Improvement Costs | @ $1.70 x 58,094 sq. ft. | $  98,760 |
| General/Administrative | @ $0.50 x 72,260 sq. ft. | $  36,130 |
| Management | @ 3% of EGI | $  32,301 |
| Leasing Commissions | @ 5% of EGI | $  53,835 |
| Replacement Reserves | @ 1% of EGI | $  10,767 |
| TOTAL: EXPENSES | | ($  504,836) |

NET OPERATING INCOME                          $  571,855

| | |
|---|---|
| Capitalization Rate | 7.21% |
| Plus: Effective Tax Rate | 1.85% |
| TOTAL CAPITALIZATION RATE | 9.06% |

INDICATED VALUE                               $6,311,865

Having reached a conclusion of the true market value of the subject property, the court will determine the correct assessment for the 2009, 2010, 2011, 2012 and 2013 tax years. Under N.J.S.A. 54:51A-6(a), commonly referred to as Chapter 123, when the court is satisfied in a non-revaluation year by the evidence presented "that the ratio of the assessed valuation of the subject property to its true value exceeds the upper limit or falls below the lower limit of the common level range, it shall enter judgment revising the taxable value of the property by applying the average ratio to the true value of the property...." N.J.S.A. 54:51A-6(a). This process involves application of the Chapter 123 common level range. N.J.S.A. 54:1-35a(b). When the ratio of assessed value exceeds the upper limit or falls below the lower limit, the formula for determining the revised taxable value of property, under N.J.S.A. 54:51A-6(a), is as follows:

True market value     x     Average ratio =     Revised taxable value

For the 2009 tax year, the ratio of total assessed value, $3,153,000, to true market value, $6,637,978, yields a ratio of .475% which exceeds the upper limit of the Chapter 123 common level range. Consequently, the calculation for the 2009 tax year is:

$6,637,978     x     .3842 =     $2,550,300 [ROUNDED]

Accordingly, a judgment establishing the local property tax assessment for the subject property for tax year 2009 will be entered as follows:

| | |
|---|---|
| Land | $1,959,100 |
| Improvement | $ 591,200 |
| Total | $2,550,300 |

For the 2010 tax year, the ratio of total assessed value, $3,153,000, to true market value, $6,929,463, yields a ratio of .455% which exceeds the upper limit of the Chapter 123 common level range. Consequently, the calculation for the 2010 tax year is:

$6,929,463     x     .3905%     =     $2,706,000 [ROUNDED]

Accordingly, a judgment establishing the local property tax assessment for the subject property for tax year 2010 will be entered as follows:

| | |
|---|---|
| Land | $2,061,600 |
| Improvement | $ 644,400 |
| Total | $2,706,000 |

For the 2011 tax year, the ratio of total assessed value, $3,153,000, to true market value, $6,707,771, yields a ratio of .4701% which exceeds the upper limit of the Chapter 123 common level range. Consequently, the calculation for the 2011 tax year is:

$6,707,771　　X　　.40%　=　　$2,683,100 [ROUNDED]

Accordingly, a judgment establishing the local property tax assessment for the subject property for tax year 2011 will be entered as follows:

| | |
|---|---|
| Land | $2,061,600 |
| Improvement | $ 621,500 |
| Total | $2,683,100 |

For the 2012 tax year, the ratio of total assessed value, $3,153,000, to true market value, $6,659,161, yields a ratio of .4735% which exceeds the upper limit of the Chapter 123 common level range. Consequently, the calculation for the 2012 tax year is:

$6,659,161　　X　　.4030%　　=　　$2,683,600 [ROUNDED]

A judgment establishing the local property tax assessment for the subject property for tax year 2012 will be entered as follows:

| | |
|---|---|
| Land | $2,061,600 |
| Improvement | $ 622,000 |
| Total | $2,683,600 |

For the 2013 tax year, the ratio of total assessed value, $3,153,000, to true market value, $6,311,865, yields a ratio of .4995% which exceeds the upper limit of the Chapter 123 common level range. Consequently, the calculation for the 2013 tax year is:

$6,311,865　　X　　.4115%　　=　　$2,597,300 [ROUNDED]

Accordingly, a judgment establishing the local property tax assessment for the subject property for tax year 2013 will be entered as follows:

| | |
|---|---|
| Land | $1,959,100 |
| Improvement | $   638,200 |
| Total | $2,597,300 |

Very truly yours,


/s/Hon. Joshua D. Novin, J.T.C.